**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISON**

| | | |
|---|---|---|
| CASSANDRA JOYCE HEFFNER, | ) | CASE NO. 1:20-CV-00540-CAB |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | UNITED STATES DISTRICT JUDGE |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL SECURITY, | ) | CARMEN E. HENDERSON |
| | ) | |
| Defendant, | ) | **REPORT & RECOMMENDATION** |
| | ) | |

## I. Introduction

Plaintiff, Cassandra Joyce Heffner ("Heffner" or "Claimant"), seeks judicial review of the final decision of the Commissioner of Social Security denying her applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). For the reasons set forth below, it is RECOMMENDED that the Court OVERRULE Claimant's Statement of Errors and AFFIRM the Commissioner's decision.

## II. Procedural History

On March 7, 2017, Claimant filed applications for DIB and SSI, alleging a disability onset date of August 1, 2011. The applications were denied initially and upon reconsideration, and Claimant requested a hearing before an administrative law judge ("ALJ"). (ECF No. 13, PageID #: 232). On October 10, 2018, an ALJ held a hearing, during which Claimant, represented by counsel, and an impartial vocational expert testified. (ECF No. 13, PageID #: 108-138). On

December 31, 2018, the ALJ issued a written decision finding Claimant was not disabled.  (ECF No. 13, PageID #: 82).  The ALJ's decision became final on January 14, 2020, when the Appeals Council declined further review.  (ECF No. 13, PageID #: 74).

On March 11, 2020, Claimant filed her Complaint to challenge the Commissioner's final decision.  (ECF No. 1.)  The parties have completed briefing in this case. (ECF Nos. 17, 19, 20).  Claimant asserts the following assignments of error:

1. The ALJ committed harmful error when he failed to properly evaluate the evidence in this matter.

2. The ALJ's determination regarding credibility was erroneous in that it was not supported by substantial evidence and violated Social Security Ruling 16-3p.

3. The ALJ committed harmful error when he did not meet his burden at Step Five of the Sequential Evaluation.

(ECF No. 17 at 1).

## III. Background

### A. Relevant Hearing Testimony

The ALJ summarized the relevant testimony from Claimant's hearing:

> At the hearing, the claimant testified that she is unable to work due to anxiety. Her anxiety worsens when she is around people, especially when she is around more than five people. Her anxiety also worsens during confrontations and arguments. She has trouble concentrating described as jumping from one thing to another. The claimant further testified that she forgets to take her medication so her mother calls her daily to remind her. She does household chores when she is able to focus, and her mother comes over to help her with them. The claimant testified that she has pain in her back (mid and low back) and legs. The pain is "constant" and at a 6/10 with medications (8/10 without medications). She can sit for 60 minutes; stand for 120 to 180 minutes; walk around the block twice; and lift 20 pounds.

(ECF No. 13, PageID #: 91).

During the hearing, the ALJ posed the following hypothetical:

> assume a hypothetical individual of the Claimant's age and education. Further assume that the hypothetical individual is limited as follows. In hypothetical #1, these are non-exertional only. Limited to performing simple, routine, and repetitive tasks, but not at a production rate pace, i.e., assembly line work. Limited to simple work-related decisions and using her judgement and dealing with changes in the work setting. Able to occasionally interact with supervisors, coworkers, and the public.

(ECF No. 13, PageID #: 132-133). The vocational expert testified that such a person would be able to perform work at several exertional levels, including medium exertion, and that multiple jobs were available for such a person such as a kitchen helper, gluer, and an assembler of electrical accessories. (ECF No. 13, PageID #: 133). In a second hypothetical, the ALJ modified the limitations to include never interacting with the public. (ECF No. 13, PageID #: 133). The vocational testified that the additional limitation would not change the jobs identified. (ECF No. 13, PageID #: 134). In a third hypothetical, the ALJ added the following limitations to the first and second hypothetical: "limited to medium, frequent climbing of ramps and stairs. Occasional climbing of ladders, ropes, or scaffolds. Frequently balance, stoop, kneel, crouch, crawl. Occasional exposure to unprotected heights, moving mechanical parts, and the operation of a motor vehicle. Frequent exposure to humidity and wetness, dust, odors, and pulmonary irritants, extreme cold and extreme heat[.]" (ECF No. 13, PageID #: 134). Again, the jobs identified remained unchanged. (ECF No. 13, PageID #: 134). In the fourth hypothetical, the ALJ modified the first and second hypotheticals as follows: "to light [exertional level], occasional climbing of ramps and stairs, never to climb ladders, ropes, or scaffolds. Occasional balance, stoop, kneel, crouch, crawl. Never to be exposed to unprotected heights, moving mechanical parts or operate a motor vehicle. Frequent exposure to humidity and wetness, dust, odors, fumes, and pulmonary irritants, extreme cold and extreme heat." (ECF No. 13, PageID #: 134). The vocational expert

3

testified that the gluer and assembler of electrical accessories position would remain but substituted an inspector and hand packager as the third job available. (ECF No. 13, PageID #: 135). In hypothetical number five, the ALJ added that in additional to normal breaks, the individual would be off task more than 20% of an eight-hour workday and/or be absent more than two days each month. (ECF No. 13, PageID #: 135). The vocational expert testified that each of the additional limitations would be work preclusive. (ECF No. 13, PageID #: 135).

Ultimately, the ALJ adopted an RFC that included the limitations referenced in the third hypothetical. (*Compare* ECF No. 13, PageID #: 91, *with* ECF No. 13, PageID #: 101 and 134).

**B. Relevant Medical Evidence**

The ALJ also summarized Claimant's health records and symptoms:

> In terms of the claimant's alleged physical limitations, mental limitations, and symptoms including pain and periods of poor concentration, a review of the record shows that on January 17, 2011, the claimant told primary care physician Michael Rish, M.D., that she was depressed and anxious. Dr. Rish prescribed Zoloft and he referred the claimant to the Nord Center for counseling (2F/23).
>
> On June 27, 2011, the claimant was admitted to EMH Regional Medical Center for two days following an overdose of medication in a suicide attempt secondary to family conflict with her father and her boyfriend. The claimant explained that she had been living with her grandmother, but two weeks ago she moved back with her parents. She described her father as being very paranoid-he would not let her go to school because he was afraid that she would contact germs, so she did home schooling and took care of her younger brother while their mother worked. She recently had a break up with her boyfriend and was kicked out of the grandmother's house, so she had moved to her parents' house. Per the claimant, her father said that he would be better off if she was not around so she took an overdose on her father's medication. She reported seeing a psychiatrist in the past, but only one time, and did not follow through. She further reported that she had not been sleeping well in the last six months and that she admitted she had mood swings. Razia Ahmed, M.D., diagnosed the claimant with bipolar type 2 and started the claimant on Saphris for mood stabilization. On June 29, 2011, the claimant was discharged in an improved condition. The

claimant planned to move in with a cousin, go through Job Core, and find a job (4F/37-38, 56).

On August 5, 2011, the claimant presented at the Emergency Department after intentionally overdosing on Prednisone in the context of a situational problem of fighting/arguing with her cousin. The claimant had a history of bipolar disorder and prior suicide attempts. The claimant stated that she was depressed, frustrated, and she did not believe that anyone cared about her although her uncle was the one who called EMS. The claimant was transferred to Laurelwood for admission (10F/51-59; 2F/32).

On August 15, 2011, the claimant met with her therapist, Patricia Normile, LPCC, at Firelands Counseling. The claimant stated that when she was at the hospital she discussed with counselors about getting rid of the "toxic" people in her life. The toxic people was first of all her dad who sexually, emotionally, and verbally abused her. The claimant was currently living with her boyfriend and her cousin and she said that she was going to Florida for a few weeks because they said she needed a vacation. The claimant had severed relationships with her immediate family, but she was in contact with other relatives that she was not allowed to see when she was growing up because her father was so controlling. The claimant said that she would talk to her mother, but not as long as she was involved with her father. She said what triggered her recent suicide attempt was an argument with her father. The claimant further stated that her medication was working and she has a three-month supply. On examination, the claimant's affect was anxious; she was oriented; and her behavior was cooperative (1F/3).

On September 16, 2011, the claimant saw Dr. Rish. The claimant stated that she had been hospitalized in August 2011 for overdosing on Prednisone in the context of being angry with her father. The claimant planned to not communicate any further with her parents. Dr. Rish refilled the claimant's Celexa and Saphris and referred the claimant to group counseling (2F/21).

On March 24, 2012, the claimant was admitted to EMH Healthcare for four days due to depression and thoughts of suicide with a plan to overdose on medication. The claimant was living with her parents and she reported having a fight with her father recently and during the fight, her father suggested "why don't you kill yourself." She also reported difficulty sleeping due to her father turning the television up too loudly at night and she reported decreased energy. She stated that her primary care physician had been treating her bipolar disorder and she had been noncompliant with her medications, off

of them for at least a week. In addition, she had not been going to her counseling appointments at Firelands. The claimant was treated with Celexa, Saphris, and Vistaril and her affect markedly improved. On March 28, 2012, the claimant was discharged to her mother with instructions to follow up at the Nord Center. The claimant said that she intended to finish her GED and she was given a referral to BVR because she wanted to work, but said that when she applied for a job, she did not get the job, so she was referred to the BVR program to improve her skills and to get some job placement through that BVR services (4F/24-27).

In September 2012, x-rays of the left ankle showed no abnormality (5F/23).

On August 26, 2014, the claimant saw Dr. Rish. The claimant reported that she had been going to the Nord Center for outpatient mental health services, but she now lived in North Olmsted with her cousin and the Nord Center was too far away. The claimant wanted Dr. Rish to take over prescribing her psychotropic medications. The claimant had previous suicide attempts in 2011, but she reported no suicide attempts or thoughts for many years and she said that her medications kept her bipolar disorder "under good control." The claimant denied distractibility, insomnia, grandiosity, flight of ideas, racing thoughts, pressured speech, hyperactivity, agitation, periods of excess energy, periods of euphoria, loss of interests, depressed mood, sleep disturbance, fatigue, sense of failure, poor concentration, explosive anger, or labile moods. The claimant also had asthma with symptoms nearly daily, but she had run out of her asthma medication a few weeks ago. On examination, the claimant was alert, cooperative, and well groomed. Her mood and affect were normal. Her eye contact was good and her speech was normal. Her attention span and ability to concentrate were normal. Dr. Rish diagnosed bipolar disorder and he continued Seroquel and Depakote. He diagnosed suboptimal control of asthma and he started Dulera and Ventolin "as needed" (2F/10-11).

On June 13, 2015, the claimant presented at the Emergency Department after taking about 10 Seroquel tablets. The claimant initially stated that she was "just upset" and did not want to elaborate, but later in the day she admitted that she had been feeling "stressed" and that she was attempting to end of her life. She described a lack of family support. She lived with a friend and his parents, but apparently her friend had a fight with his father and now they had to find somewhere else to live. This was the trigger for the claimant's attempt to end her life. The claimant stated that she had been taking her Depakote and Seroquel as prescribed. She denied a

6

history of drug/alcohol abuse and she did not have any legal issues. She also denied a history of abuse or trauma (10F/26, 34-35). The next day, the claimant was admitted to University Hospitals for three days where her doses of Seroquel and Depakote were increased. Her family expressed concern about the claimant's lack of medication compliance in the past which they believed was the major factor that led to her suicide attempts. The claimant's depressive symptoms gradually improved and on June 17, 2015, the claimant was discharged to home with instructions to follow up at the Nord Center (2F/14-l 7).

On June 23, 2015, the claimant sought outpatient mental health services at the Nord Center, accompanied by her mother. The claimant reported that she was recently hospitalized for an overdose on Seroquel and she had been stressed about her finances and finding a place of her own when she attempted to take her life. She also reported a lot of emotional and verbal abuse by her father who was diagnosed with bipolar disorder as well. The claimant had previously been referred to the Nord Center in March 2012, but never followed through. The intake social worker recommended pharm management, counseling, and case management (7F/14-23).

On July 22, 2015, the claimant started to treat with F. Gregory Noveske, M.D., at the Nord Center. The claimant reported that she was doing well with no vegetative symptoms. She was living with her parents in Elyria, but hoping to obtain her own apartment. She was working to get her GED and she was working 30 to 32 hours weekly at a Marc's as a cashier. She enjoyed cooking, writing, and spending time with friends. On examination, the claimant was well groomed; her demeanor was average; her eye contact was average; her activity was average; her speech was clear; her thought process was logical; her mood was mildly depressed; her behavior was cooperative; her attention and concentration were mildly impaired; and her insight and judgment were fair to poor. Dr. Noveske diagnosed bipolar disorder. He stopped Depakote, increased Seroquel, and he asked the claimant to follow up in four to six weeks (7F/24-28).

On January 27, 2016, the claimant saw Dr. Noveske. The reported increased anxiety since she ran out of the Seroquel about one month ago. The claimant was now in a new apartment, but had a cut in her work hours, which had been a financial concern for her. The claimant had no significant vegetative symptoms and no suicidal ideation. Dr. Noveske restarted Seroquel and he asked the claimant to return in three months (7F/46-47).

In March 2016, x-rays of the claimant's shoulders were normal (3F/4).

On April 27, 2016, the claimant returned to see Dr. Noveske. She reported feeling much better since the Seroquel was restarted. However, she had been experiencing some panic attacks, primarily related to her use of a car. She was involved in a motor vehicle accident some months ago which seems to have triggered these episodes. Her boyfriend was back from South Korea, where he had been stationed, and she had been seeing him. The claimant had no depression, no vegetative symptoms, and no suicidal ideation. Dr. Noveske added Prozac and he asked the claimant to return in two months (7F/44-45).

On June 29, 2016, the claimant reported continued anxiety primarily related to the use of a motor vehicle related to her motor vehicle accident. The claimant had no significant vegetative symptoms and no suicidal ideation. Dr. Noveske increased Prozac, continued Seroquel, and he asked the claimant to return in three months (7F/42-43).

In October 2016, the claimant's asthma was described as mild intermittent (5F/7).

On January 19, 2017, the claimant was admitted to University Hospitals for three days due to worsening depression and suicidal ideation. The claimant reported that her mood had been getting more and more depressed since Thanksgiving in the context of running out of her medication and not getting refills on her medication. She further reported that since she had been off the medication, her mood was overall severe depressed; she had not been able to enjoy anything; she had no desire or motivation to do things; she had not been sleeping well at night; she felt hopeless, helpless, and worthless; she had a significant amount of anhedonia; and she had poor concentration. The claimant was started on Seroquel and Prozac and on January 22, 2017, the claimant was discharged to home. At discharge, the claimant was cooperative; her memory was intact; attention and concentration were fair; her mood was "good"; her affect was overall bright appearing, stable, nonreactive, and non-labile; her speech was clear; her thought form was linear and goal-directed; and her judgment and insight were improved (4F/3-7).

On January 31, 2017, the claimant told her case manager that she had done well since getting back on medication. She hoped to move out soon from her parent's home soon due to conflicts with her father-she said, "we're too alike and it causes fights. Things were

8

better with him when I lived on my own" (7F/48).

On March 6, 2017, the claimant saw Dr. Noveske after a "fairly" long hiatus. The claimant reported that her previous roommate stole her medications and she subsequently had a recurrent depression, which ended up in a hospitalization. However, she was back to baseline now on her medications. She had no suicidal ideation or significant vegetative symptoms. She was job hunting. Dr. Noveske made no medication changes (7F/36-37).

On April 19, 2017, the claimant attended a psychological consultative examination conducted by Ronald Smith, Ph.D. The claimant reported a history of about ten suicide attempts, mostly by overdose. She also reported trouble concentrating, not finishing tasks, and jumping from one thing to another. She explained that she jumps from one thing to another and gets bored and loses interest quickly. On examination, the claimant was neat and clean; she was friendly and cooperative; her responses were direct and to the point and her thinking was well organized; and she showed appropriate affective expression with a good range of affect. In terms of anxiety, the claimant told Dr. Smith that when her dad yells "I get really nervous"; when she's alone and she hears regular house noises she gets nervous and she gets nervous when she's a passenger in a car; she's okay in a store if she doesn't have a "closed in feeling"; and she will have panic attacks nowadays but not on a daily basis. In terms of sensorium and cognitive functioning, she was alert and in good contact with reality; she counted backwards from 20 to 1 in 14 seconds and said the alphabet in 7 seconds, both with no errors; she counted from 1 to 40 by threes in 40 seconds, but made two mistakes; and on Digit Span, she remembered six digits forward, but only three digits backward. Her insight and judgment appeared to be quite good. Dr. Smith diagnosed attention deficit hyperactivity disorder, combined presentation; and persistent depressive disorder (dysthymia) with intermittent major depressive episodes, with current episode, moderate, in partial treatment remission (8F).

(ECF No. 13, PageID #: 91-95).

### C.  Opinion Evidence at Issue

#### 1.  Haralambi Siscu, M.D. – Primary Care Physician

On September 14, 2018, Dr. Haralambi Siscu, Claimant's primary care physician, opined that Claimant could walk two blocks without requiring rest or being in severe pain; could sit for

one hour at a time; stand for 30 minutes at a time; sit and stand/walk for about four hours in an eight hour work day; required a job that would allow her to shift positions at will; required a job that allowed her to walk for fifteen minutes every hour; and needed one to two unscheduled ten-minute breaks a day due to her pain and anxiety. (ECF No. 13, PageID #: 878). Additionally, Dr. Siscu opined that Claimant could frequently carry ten pounds, occasionally carry twenty pounds, but rarely carry fifty pounds; frequently twist; occasionally stoop, climb stairs, and climb ladders; and rarely crouch. (ECF No. 13, PageID #: 879). Dr. Siscu opined that Claimant would be off task 25% or more in a workday; is only capable of low stress work; and would likely be absent from work four days a month due to her impairments. (ECF No. 13, PageID #: 880). Dr. Siscu explained that the limitations included in the opinion were caused by Claimant's anxiety, depression, and bipolar disorder. (ECF No. 13, PageID #: 880).

The ALJ gave Dr. Siscu's opinion little weight explaining that: "it is not consistent with the unremarkable findings on examination and the limited course of treatment. Furthermore, the part of the opinion about the claimant's 25% off-task behavior is not supported by any findings (see above and see 5F/3-4; 12F/5)." (ECF No. 13, PageID #: 99). The ALJ also noted that Dr. Siscu was Claimant's primary care physician and had treated Claimant twice a year since February 2017. (ECF No. 13, PageID #: 99).

Claimant argues the ALJ failed to give good reasons for giving little weight to the opinion Dr. Siscu.

### 2. Kyle E. Walker, M.D. – Consultative Examiner

On May 6, 2017, Dr. Kyle Walker performed a consultative examination on Claimant. Dr. Walker's physical examination findings included 5/5 strength in upper and lower extremities; negative straight leg raises; normal gait; no signs of acute or healing lumbar fractures; normal disc

spacing; no signs of inflammation or degeneration in lumbar region; normal spacing of hip joint with no signs of degeneration; bony pelvis intact and within normal limits; normal lumbar x-ray; and normal knee x-ray. (ECF No. 13, PageID #: 610-611). Walker diagnosed Claimant with chronic low back pain and chronic bilateral knee pain. (ECF No. 13, PageID #: 611). In the medical source statement, Walker stated:

> Claimant is a 24-year-old white right-hand dominate female that presents today with complaints of knee and back problems that have been present for about 6 years [ ] without a known inciting event. The pain is constant in nature. The pain is described as stabbing, throbbing, and pressure in character. A PCP who prescribed the Naprosyn and Tylenol has evaluated her for this. Her previous doctor had her on [an] opiate medication that has been discontinued for the possible addictive nature. She has not tried physical therapy, injection therapy, manipulation therapy, or other forms of pain relief at this point. The pain is worse on the right than the left. She is scheduled to see a physician in the near future for further evaluation and possible PT. Her physical exam today is unremarkable. X-ray of the right knee and lumbar spine today show[] no remarkable findings. By report, she may have mild limitations with standing/walking for extended periods of time (greater than 30-60 minutes). I do not appreciate any functional physical limitations assessable today. Any limitations she has would be entirely secondary to perceived levels of pain. It is worth noting that she has multiple treatment modalities still available that she has yet to try, any of which [ ] would likely significantly alleviate her pain and, thusly, her limitations.
>
> The claimant does not have any limitations with sitting, lifting, carrying, handling, hearing, speaking, traveling, or with memory.

(ECF No. 13, PageID #: 611).

The ALJ gave considerable weight to Dr. Walker's opinion "particularly the part that any limitations would be entirely secondary to perceived levels of pain." (ECF No. 13, PageID #: 96).

The Claimant does not dispute the weight given to Dr. Walker's opinion, but argues that the ALJ erred by not finding her back pain and knee pain were severe impairments and by not including a stand/sit limitation of no more than 30/60 minutes at a time. (ECF No. 17 at 12, 14).

11

### 3.   State Agency Reviewing Physicians

State agency reviewing physicians, Drs. Obiaghanwa Ugbana and Lynne Torello, reviewed Claimant's file initially and upon reconsideration. Both doctors opined that Claimant had no severe physical impairments. (ECF No. 13, Page ID #: 147, 181).

The ALJ gave these opinions considerable weight and explained that the opinions "are consistent with the unremarkable objective medical evidence, unremarkable clinical findings, and limited course of treatment. However, giving some consideration to the claimant's asthma and her subjective complaints, I find the claimant retains the ability to perform medium exertional work with the postural and environmental limitations listed above." (ECF No. 13, PageID #: 99).

Claimant does not specifically dispute the weight given to these opinions and merely issues the conclusory statement that the findings were "erroneously adopted by the ALJ as set forth above." (*See* ECF No. 17 at 14).

### 4.   State Agency Reviewing Psychologists

Irma Johnston, Psy.D. reviewed Claimant's file on April 25, 2017 and opined that Claimant had: no limitations in understanding or memory; moderate limitations in ability to maintain attention and concentration for extended periods; moderate limitations in her ability to work in coordination with or in proximity to others without being distracted; moderate limitations in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; moderate limitations in her ability to interact appropriately with the general public; and moderate limitations in her ability to respond appropriately to changes in the work setting. (ECF No. 13, PageID #: 167-169).

On September 5, 2017, Janet Souder, Psy.D., reexamined the file and agreed with Dr.

12

Johnson's opinion. (ECF No. 13, PageID #: 190-204).

The ALJ gave these opinions considerable weight and explained that the opinions "are generally consistent with the record as a whole.  However, the claimant is sensitive to stress, so I find the claimant cannot perform detailed tasks and she should be limited to simple work-related decisions." (ECF No. 13, PageID #: 99).

Claimant argues that the ALJ erred by failing to include the limitations regarding Claimant's ability to maintain attention and concentration throughout a workday and that she would need additional rest periods. Claimant argues that these limitations would have been work preclusive based on the vocational expert's testimony.

### 5. Ronald G. Smith, Ph.D. – Consultative Psychological Evaluation

On April 21, 2017, Claimant met with Dr. Ronald Smith who performed a consultative psychological evaluation at the request of the agency. (ECF No. 13, PageID #: 600). Following the interview, Dr. Smith diagnosed Claimant with attention deficit hyperactivity disorder; depressive disorder; and parent child relational problem. (ECF No. 13, PageID #: 605-606). In Dr. Smith's functional assessment of Claimant he stated that she 1) will be able to understand and remember job instructions but that her ability to carry them out successfully may be disrupted by anxiety and may lose focus and concentration; 2) may have difficulty maintaining adequate attention and concentration and in maintaining persistence in the performance of simple or more complex tasks; 3) should be able to deal appropriately with a supportive and sympathetic supervisor and coworker but may get anxious in a crowd; and 4) may become anxious in response to pressures related to inattention or failure to complete a task or in situations where she feels closed in or crowded. (ECF No. 13, PageID #: 606).

The ALJ gave Dr. Smith's opinion some weight and explained:

> [Dr. Smith] had the benefit of examining the claimant and because of his area of specialty. However, I do not give great weight to his opinion since he repeatedly used the word "may" as opposed to giving a more definitive opinion. In addition, it is apparent from parts of his opinion that he simply reiterated what the claimant told him as opposed to rendering his own professional opinion. Furthermore, based on this one-time examination, I do not accept the diagnosis of attention deficit hyperactivity disorder because the claimant's psychiatrist has not diagnosed the claimant with attention deficit hyperactivity disorder.

(ECF No. 13, PageID #: 96).

Claimant argues that "this opinion should have, at a minimum, been accorded the same weight as the reviewing psychologists. Any of the limitations set forth by Dr. Smith would have resulted in a finding of no jobs which Heffner could perform in the national economy on a sustained basis." (ECF No. 17 at 15).

## IV.  The ALJ's Decision

The ALJ made the following findings relevant to this appeal:

3. The claimant has the following severe impairments: depression, bipolar disorder, anxiety, and asthma (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except she can frequently climb ramps and stairs; occasionally climb ladders, ropes, or scaffolds; frequently balance, stoop, kneel, crouch, and crawl; occasionally be exposed to unprotected heights, moving mechanical parts, or operate a motor vehicle; frequently be exposed to humidity and wetness, dust, odors, fumes, pulmonary irritants, extreme cold, and extreme heat; limited to performing simple, routine, and repetitive tasks, but not at a production rate pace (i.e. assembly line work); limited to simple work-related decisions in using her judgment and dealing with changes in the work setting; and she is able to occasionally interact with supervisors, coworkers, and the public.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

## V. Law & Analysis

### A. Standard of Review

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

### B. Standard for Disability

The Social Security regulations outline a five-step process that the ALJ must use in determining whether a claimant is entitled to supplemental-security income or disability-insurance benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that

impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her residual functional capacity ("RFC"); and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.*

### C.  Discussion

Claimant raises three issues on appeal: 1) The ALJ committed harmful error when he failed to properly evaluate the evidence in this matter; 2) The ALJ's determination regarding credibility was erroneous in that it was not supported by substantial evidence and violated Social Security Ruling ("SSR") 16-3p; and 3) The ALJ committed harmful error when he did not meet his burden at Step Five of the Sequential Evaluation. Within the first assignment of error, Claimant argues that the ALJ improperly evaluated the evidence because he: A) failed to find that Claimant's pain in her back and legs and fibromyalgia were severe impairments; B) improperly found that Claimant had moderate limitations in each of the "B" criteria used to evaluate mental impairments; C) failed to consider Claimant's combination of impairments; D) failed to consider Claimant's fibromyalgia under SSR 12-2p; and E) improperly evaluated the medical opinion evidence. In addition to Claimant's stated issues, she also states that the ALJ erred in not granting her motion

16

for a supplemental hearing or ordering interrogatories on the vocational evidence. (ECF No. 17 at 28).

### 1. Substantial Evidence Supports the ALJ's Evaluation of the Evidence.

#### a. Step Two – Evaluation of Severe Impairments

The Claimant argues that the ALJ erred by finding that the pain in her back and legs and fibromyalgia are not "severe", and that substantial evidence does not support the RFC because it does not include limitations related to these physical impairments. (ECF No. 17 at 11-12). The Commissioner argues that Claimant's back/leg pain and fibromyalgia were not medically determinable impairments; thus, the ALJ properly found that they were not severe impairments.

As noted, the ALJ found that Claimant's chronic back and leg pain and her fibromyalgia are not severe impairments. (*See* ECF No. 13 at 88). The Court will not disturb that finding here. "In the Sixth Circuit, the severity determination is 'a de minimis hurdle in the disability determination process.'" *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) (*quoting Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). "[A]n impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education and experience." *Id.* "The goal of the test is to 'screen out totally groundless claims.'" *Id.* (*quoting Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir. 1985)).

Substantial evidence supports the ALJ's finding that Claimant's back pain, knee pain, and fibromyalgia were not severe impairments. Claimant testified that she had constant pain in her back and legs. However, the ALJ noted that objective studies and examinations resulted in normal findings. (ECF No. 13, PageID #: 88). Specifically, the ALJ explained:

> medically determinable impairment may not be established solely on the basis of a claimant's allegations regarding symptoms and must be based on objective medical evidence from an acceptable medical source (20 CFR 404.1521 and 416.921). Based on the

'normal' or 'unremarkable' objective medical evidence (see Finding
#5), I find that the claimant has no medically determinable
impairment involving the back or legs. Nonetheless, I considered the
claimant's complaints of pain.

(ECF No. 13, PageID #: 88). At Finding 5, the ALJ noted that Dr. Walker reported that Claimant

had a normal gait, fully intact strength and sensation in her extremities, a negative straight leg

raising test, and unremarkable x-rays of her right knee and lumbar spine. (ECF No 13, PageID #:

96).

Claimant argues that Dr. Walker's diagnosis and opinion supports a finding of a severe

impairment. (ECF No. 17 at 14). However, Claimant inaccurately characterizes Dr. Walker's

words. Specifically, Dr. Walker opined "I do not appreciate any functional physical limitations"

and that Claimant's "physical exam today is unremarkable. X-ray of the right knee and lumbar

spine today show[] no remarkable findings." (ECF No. 13, PageID #: 611). The 30-60 minute

stand/walk limitation was not Dr. Walker's opinion, but rather, a "report" of the Claimant's

subjective indications. (ECF No. 13, PageID #: 611 ("By report, she may have mild limitations

with standing/walking for extended periods of time (greater than 30-60 minutes).")). Dr. Walker

also stated that "[a]ny limitations she has would be entirely secondary to perceived levels of pain.

It is worth noting that she has multiple treatment modalities still available that she has yet to try,

any of which [ ] would likely significantly alleviate her pain and, thusly, her limitations." (ECF

No. 13, PageID #: 611).

Additionally, the rheumatologist, Dr. Kontzias, examined Claimant and diagnosed her with

hyperthyroidism, enthesitis, and chronic pain of left knee. However, Dr. Kontzias found she had

good range of motion in her knees, fully intact muscle strength, normal muscle tone, and

unremarkable x-rays of her thoracic spine. (ECF No 13, PageID #: 97, 742-753). Dr. Kontzias

instructed Claimant to take acetaminophen and meloxicam and to follow up as needed. (ECF No. 13, PageID#: 745-750).

Claimant has failed to cite to any medical evidence that supports a finding of a severe impairment. Accordingly, substantial evidence supports the ALJ's decision that Claimant's back pain and knee pain were not severe impairments.

With respect to fibromyalgia, the ALJ stated: "there is insufficient evidence to demonstrate compliance with [SSR] 12-2p, Evaluation of Fibromyalgia, so fibromyalgia has not been properly established as a medically determinable impairment. Nonetheless, I considered the claimant's subjective complaints of pain." (ECF No. 13, PageID #: 88). SSR 12-2p establishes special rules for how ALJs evaluate whether fibromyalgia is a severe impairment at step two. SSR 12-2p, 2012 WL 3104869 at *2-*3. The claimant must generally provide medical evidence as outlined in SSR 12-2p, and "cannot rely upon the physician's diagnosis alone." Here, other than a single diagnosis and Claimant's statement, no evidence establishes that Claimant has a medically determinable impairment of fibromyalgia. The ALJ accurately noted that, although Claimant stated that she was being "worked up" for fibromyalgia and Dr. Siscu indicated that Claimant had been diagnosed with fibromyalgia, there was no evidence in the record that fibromyalgia was diagnosed in compliance with SSR 12-2p. (ECF No. 13, PageID #: 88, 452, 877). Accordingly, substantial evidence supports the ALJ's decision that Claimant's does not suffer a medically determinable impairment of fibromyalgia.

Moreover, the failure to find an impairment severe is harmless error where other impairments are deemed severe. *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987). Here, the ALJ found that Claimant suffered numerous severe impairments: "depression, bipolar disorder, anxiety, and asthma[.]" (ECF No. 13, PageID #: 88). Therefore,

Claimant "cleared step two of the analysis." *Anthony*, 266 F. App'x at 457. "This caused the ALJ to consider [Claimant's] severe and nonsevere impairments in the remaining steps of the sequential analysis. The fact that some of [Claimant's] impairments were not deemed to be severe at step two is therefore legally irrelevant." *Id.* (*citing Maziarz*, 837 F.2d at 244).

The ALJ considered Claimant's pain when determining the RFC. Specifically, the ALJ summarized Claimant's hearing testimony that "she has pain in her back (mid and low back) and legs. The pain is 'constant' and at a 6/10 with medications (8/10 without medications). She can sit for 60 minutes; stand for 120 to 180 minutes; walk around the block twice; and lift 20 pounds." (ECF No. 13, PageID #: 91). The ALJ then found that "claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision. In particular, the claimant's allegations are out of proportion to the medical evidence and other evidence." (ECF No. 13, PageID #: 91). In the recitation of Claimant's medical history, the ALJ highlighted Claimant's treatment for pain:

> In September 2012, x-rays of the left ankle showed no abnormality (5F/23).

(ECF No. 13, PageID #: 93);

> On May 6, 2017, the claimant attended a physical consultative examination conducted by Kyle Walker, M.D., with a chief complaint of bilateral knee and back problems. The claimant reported constant pain typically at 7/10. She said she could sit for up to 2 hours and stand/walk for 30 minutes without issues. The claimant was taking Naproxen and Tylenol. On examination, the claimant was well appearing; her lungs were clear; her gait was normal; she had 5/5 (normal) strength in all extremities; sensation in all extremities was intact; and straight leg raising was negative. X-rays of the right knee and lumbar spine showed no remarkable findings. (9F).

20

> Dr. Walker did not appreciate any functional physical limitations. He stated, by report, she "may" have "mild" limitations with standing/walking for extended periods of time (greater than 30-60 minutes). He opined that any limitations she has would be entirely secondary to perceived levels of pain. He noted that she had multiple treatment modalities still available that she had yet tried, any of which would likely significantly alleviate her pain and, thusly, her limitations. He opined that the claimant did not have any limitations with sitting, lifting, carrying, handling, hearing, speaking, traveling, or with memory (9F/4).

(ECF No. 13, PageID #: 96). The ALJ gave Dr. Walker's opinion considerable weight. (ECF No. 13, PageID #: 96);

> On March 12, 2018, the claimant consulted with rheumatologist Apostolos Kontzias, M.D., about bilateral knee, bilateral hip, and mid back pain. The claimant had been referred to Dr. Kontzias by her primary care physician Haralambie Siscu, M.D. The claimant reported taking Naproxen daily. On examination, the claimant was alert and in no distress. Her lungs were clear. The examination of the hips showed good range of motion. The examination of the knees showed tenderness, but no effusion and good range of motion. The claimant had 5/5 (normal) muscle strength and normal bulk and tone. X-rays of the thoracic spine were normal. Dr. Kontzias also reviewed labs and imaging and saw no evidence of an autoimmune or systemic inflammatory disease. He prescribed NSAIDs and told the claimant to return "as needed" (13F/2-6, 12-13).

(ECF No. 13, PageID #: 97); and

> On August 2, 2018, x-rays of the right hip showed no acute osseous abnormality (l5F/38).

(ECF No. 13, PageID #: 97). The ALJ then explained that he found

> that the objective medical evidence, clinical findings on examination, and course of treatment in this case are not consistent with disabling physical impairment or disabling pain and are more consistent with the stated residual functional capacity. As recounted above, the various imaging is normal or unremarkable. The physical examinations are unremarkable (see above and see 4F/10-11; 12F/5; l5F/26, 34-35). While the claimant has received medical care on a somewhat regular basis, she has not required or received frequent

care for any medical condition. From all of this, I find that the
claimant's symptoms and limitations are not as severe as alleged.

(ECF No. 13, PageID #: 97-98).

Even if the ALJ erred by failing to list her chronic back and leg pain and fibromyalgia as

severe impairments, as discussed above he considered the pain associated with these alleged

impairments in the remainder of the decision when determining the RFC (*see* ECF No. 13, PageID

#: 93-97); thus, any error is harmless.

### b. Medical Opinion Evaluation

Under the treating source rule,[1] an ALJ "must" give a treating source opinion controlling

weight if the treating source opinion is "well-supported by medically acceptable clinical and

laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in

[the] case record." *Blakley* v. *Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009)

(citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. §

404.1527(d)(2) (eff. to July 31, 2006)[3])). "It is an error to give an opinion controlling

weight simply because it is the opinion of a treating source if it is not well-supported by medically

acceptable clinical and laboratory diagnostic techniques or if it is inconsistent the with other

substantial evidence in the case record." SSR 96–2p, 1996 WL 374188, at *2 (July 2, 1996).

"If the ALJ does not accord controlling weight to a treating physician, the ALJ must still

determine how much weight is appropriate by considering a number of factors, including the length

of the treatment relationship and the frequency of examination, the nature and extent of the

treatment relationship, supportability of the opinion, consistency of the opinion with the record as

---

[1] The regulations for handling treating source evidence have been revised for claims filed after March 27, 2017. *See* 20 C.F.R. § 416.927. Claimant filed her applications before the revision took effect.

22

a whole, and any specialization of the treating physician." *Blakley*, 581 F.3d at 406 (citing *Wilson*, 378 F.3d at 544); *see also* 20 C.F.R. § 404.1527(c)(2) (eff. Aug. 24, 2012). "In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight actually assigned." *Cole v. Astrue*, 661 F.3d 931, 938 (2011); § 404.1527(c)(2). "These reasons must be 'supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting SSR 96–2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)). "This procedural requirement 'ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.'" *Id.* (quoting *Wilson*, 378 F.3d at 544). The Sixth Circuit has plainly stated that a reversal and remand of a denial of benefits is warranted, even if the record may contain substantial evidence that supports the Commissioner's decision, when the ALJ fails to provide good reasons for discounting the medical opinion of the plaintiff's treating physician. *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. April 28, 2010) (citing *Wilson*, 378 F.3d at 544).

### 1. Haralambi Siscu, M.D. – Primary Care Physician

Claimant argues the ALJ failed to give good reasons for giving little weight to the opinion her primary care physician, Dr. Haralambi Siscu. On September 14, 2018, Dr. Siscu opined that Claimant could walk two blocks without rest or severe pain; could sit for one hour at a time; stand for 30 minutes at a time; sit and stand/walk for about four hours in an eight hour work day; required a job that would allow her to shift positions at will; required a job that allowed her to walk for fifteen minutes every hour; and needed one to two unscheduled ten-minute breaks a day due to her

pain and anxiety. (ECF No. 13, PageID #: 878). Additionally, Dr. Siscu opined that Claimant could frequently carry ten pounds, occasionally carry twenty pounds, but rarely carry fifty pounds; frequently twist; occasionally stoop, climb stairs, and climb ladders; and rarely crouch. (ECF No. 13, PageID #: 879). Dr. Siscu opined that Claimant would be off task 25% or more in a workday; is only capable of low stress work; and would likely be absent from work four days a month due to her anxiety, depression, and bipolar disorder. (ECF No. 13, PageID #: 880). Dr. Siscu supported this opinion by referencing the "psychiatry evaluation." If Dr. Siscu's opinion were credited in full, Claimant would have been limited to less than a full range of sedentary, not the medium that the ALJ found, nor even light as posed in the fourth hypothetical question to the vocational expert. Furthermore, the vocational expert in this case testified that if a person was absent from work more than two times a month or off task more than 20% of the time, there would be no jobs available. (ECF No. 13, PageID #: 135-136). Thus, had the ALJ accepted Dr. Siscu's opinion as to Claimant's mental limitations, she would have been found disabled.

Instead, the ALJ gave Dr. Siscu's opinion "little weight" because: "it is not consistent with the unremarkable findings on examination and the limited course of treatment. Furthermore, the part of the opinion about the claimant's 25% off-task behavior is not supported by any findings (see above and see 5F/3-4; 12F/5)." (ECF No. 13, PageID #: 99). The ALJ also noted that Dr. Siscu was Claimant's primary care physician and had treated Claimant twice a year since February 2017. (ECF No. 13, PageID #: 99).

Of the factors the ALJ was required to consider – the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any

specialization of the treating physician – the ALJ mentioned the type and length of the treating relationship, supportability of the opinion, and consistency with Claimant's treatment records.

The ALJ specified that the only clinical finding by Dr. Siscu was that "he identified [ ] tenderness on palpation of [Claimant's] lower back." The only medical records provided from Claimant's treatment with Dr. Siscu are located at Exhibit 12F. (ECF No. 13, PageID #: 720-740). These records are for a single date of treatment, January 23, 2018, and show substantially normal observations and lab results. (ECF No. 13, PageID #: 724-740). And Claimant's recommended course of treatment was fairly insignificant consisting only of mild medication treatment. (ECF No. 13, PageID #: 722, 725, 735). Notably, there is simply no support for the limitations provided in Dr. Siscu's opinion. Claimant does not argue that the ALJ failed to consider other records, tests, or findings by Dr. Siscu, and no others are included in the record. Accordingly, based on the record before the Court and provided to the ALJ, the ALJ properly found that Dr. Siscu's opinion was not supported by his records.

Second, Dr. Siscu's limitations are inconsistent with the record. With respect to the physical limitations, Dr. Siscu's opinion was inconsistent with Claimant's limited course of treatment for low back and knee pain and her unremarkable physical examination findings, including a normal gait, 5/5 strength in her extremities, a negative straight leg raising test, intact sensation, and negative x-rays of her lumbar spine and knees. (ECF No. 13, PageID #: 610-611); *see Gregory v. Comm'r of Soc. Sec.*, No. 1:17 CV 176, 2018 WL 1535194, at \*7 (N.D. Ohio Mar. 29, 2018) (MJ Baughman) (ALJ's emphasis on normal examination findings provided substantial evidence for affording little weight to treating source opinion). With respect to Dr. Siscu's opined mental limitations, there is no support in the record that Claimant would be off task 25% of the

time nor that she required additional breaks. Claimant fails to cite to any part of the record that supports these limitations. (*See* ECF No. 17 at 16).

Here, the ALJ's explanation sufficiently mentioned several of the factors to be considered when giving a treating physician less than controlling weight. The reasons are supported by the evidence in the case record and are sufficiently specific to make clear to any subsequent reviewers the reasons for the weight given to Dr. Siscu's opinion. Accordingly, the ALJ's explanation for the weight given to Dr. Siscu's opinion meets the good reasons requirement.

### 2. State Agency Reviewing Physicians

Claimant argues that the ALJ erred by "adopting" the opinions of the State agency reviewing physicians who each opined that Claimant had no severe impairments. (ECF No. 17 at 14). Claimant's premise is faulty. Although the ALJ gave these opinions considerable weight (ECF No. 13, PageID #: 99), he also found that Claimant suffered from asthma as a severe limitation (where the physicians had not) and included environmental limitations related to this severe impairment in the RFC. (ECF No. 13, PageID #: 90, 99). Additionally, although the ALJ did not find Claimant's leg and back pain were a severe impairment, he included postural limitations in the RFC and limited her to medium exertional work. (ECF No. 13, PageID #: 90, 99). Moreover, as explained above, the ALJ's finding that Claimant's back and leg pain were not severe impairments is supported by the record. There is no error here.

### 3. State Agency Reviewing Psychologists

The State agency reviewing psychologists opined that Claimant was moderately limited in her ability to: maintain attention and concentration for extended period; work in coordination with or in proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent

pace without an unreasonable number and length of rest periods; interact appropriately with the general public, ability to accept instructions and respond appropriately to criticism from supervisors; and respond appropriately to changes in the work setting. (ECF No. 13, PageID #: 167-169, 190-204).

Claimant argues that because the ALJ gave the State agency reviewing psychologists' opinions considerable weight, he erred by not including limitations regarding her ability to maintain attention and concentration throughout the workday and need for additional breaks. (ECF No. 17 at 14). However, with respect to Claimant's moderate limitations in her ability for sustained concentration and persistence capacities, the psychologists also opined that  Claimant was "[c]apable of sustaining an ordinary routine" and that she can "carry out simple and detailed tasks in settings where there is no demand for a fast pace." (ECF No. 13, PageID #: 168, 200). The ALJ actually found Claimant more limited  than the psychologists opined  and explained: "I give considerable weight to their opinions because they are generally consistent with the record as a whole. However, the claimant is sensitive to stress, so I find the claimant cannot perform detailed tasks and she should be limited to simple work-related decisions." (ECF No. 13, PageID #: 99). Thereafter, the ALJ incorporated limitations for sustained concentration and persistence (and her additional mental limitations) in the RFC by limiting her to "performing simple, routine, and repetitive tasks, but not at a production rate pace (i.e. assembly line work); limited to simple work-related decisions in using her judgment and dealing with changes in the work setting; and she is able to occasionally interact with supervisors, coworkers, and the public." (ECF No. 13, PageID #: 90).

The ALJ is not obligated to explain every omitted restriction from a non-treating physician's opinion. *See Martin v. Comm'r of Soc. Sec.,* 658 F. App'x 255, 259 (6th Cir. 2016)

("Martin protests the ALJ's lack of explanation as to why Martin's marked impairment in interacting with the general public—as found by Dr. Joslin—and his moderate to marked impairment in his ability to sustain concentration—as found by Dr. Rutledge—were not explicitly incorporated into Martin's RFC. But because Dr. Rutledge and Dr. Joslin are non-treating sources, the reasons-giving requirement is inapplicable to their opinions."). All that was required was for the ALJ to "say enough to allow the appellate court to trace the path of his reasoning." *Stacey v. Comm'r of Soc. Sec.*, 451 F. App'x 517, 519 (6th Cir. 2011) (citation and internal quotations omitted). The ALJ did that here.

### 4.  Ronald G. Smith, Ph.D. – Consultative Psychological Exam

In Dr. Smith's functional assessment he opined that Claimant: 1) will be able to understand and remember job instructions but that her ability to carry them out successfully may be disrupted by anxiety and may lose focus and concentration; 2) may have difficulty maintaining adequate attention and concentration and in maintaining persistence in the performance of simple or more complex tasks; 3) should be able to deal appropriately with a supportive and sympathetic supervisor and coworker but may get anxious in a crowd; and 4) may become anxious in response to pressures related to inattention or failure to complete a task or in situations where she feels closed in or crowded. (ECF No. 13, PageID #: 606).

The ALJ gave Dr. Smith's opinion some weight and explained:

> [Dr. Smith] had the benefit of examining the claimant and because of his area of specialty. However, I do not give great weight to his opinion since he repeatedly used the word "may" as opposed to giving a more definitive opinion. In addition, it is apparent from parts of his opinion that he simply reiterated what the claimant told him as opposed to rendering his own professional opinion. Furthermore, based on this one-time examination, I do not accept the diagnosis of attention deficit hyperactivity disorder because the claimant's psychiatrist has not diagnosed the claimant with attention deficit hyperactivity disorder.

28

(ECF No. 13, PageID #: 96).

Claimant argues that "this opinion should have, at a minimum, been accorded the same weight as the reviewing psychologists. Any of the limitations set forth by Dr. Smith would have resulted in a finding of no jobs which Heffner could perform in the national economy on a sustained basis." (ECF No. 17 at 15). The Commissioner argues the ALJ gave proper weight to Dr. Smith's opinion. (ECF No. 19 at 19-20). This Court agrees with the Commissioner.

Consultative examiners, such Dr. Smith, are "other medical sources", requiring the ALJ to consider several factors when determining the weight to give the opinions. *Gayheart*, 710 F.3d at 375–76. These factors include the length and nature of the relationship, evidence that the physician offered in support of his or her opinion, whether the opinion is consistent with the record as a whole, whether the physician was practicing in his or her specialty, and other factors such as the sources familiarity with claimant's history and record. *Id.*; 20 C.F.R. § 404.1527(c). Generally, more weight is given to the medical opinion of a source who has examined a claimant than to the medical opinion of a medical source who has not examined the claimant. 20 C.F.R. § 404.1527(c)(1). However, the opinion of a reviewing state agency physician may outweigh the opinion of an examining physician where it is more consistent with the overall record evidence. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514–15 (6th Cir. 2010).

Here, the ALJ explained that he gave some weight to Dr. Smith's opinion because he had the benefit of examining Claimant (20 C.F.R. § 404.1527(c)(1)) and because he was a specialist in psychology and was opining about Claimant's mental impairments (20 C.F.R. § 404.1527(c)(5)). (ECF No. 13, PageID #: 96). However, the ALJ did not give great weight to Dr. Smith's opinion because he repeatedly qualified it with the word "may" and because his opinion was largely based on Claimant's self-reported limitations (her reported ability to stand/walk) rather than on objective

findings and his professional opinion. (ECF No. 13, PageID #: 96); 20 C.F.R. § 404.1527(c)(3) & (4); *see Lockhart v. Colvin*, No. 5:14-CV-00852, 2015 WL 1505767, at *6 (N.D. Ohio Apr. 1, 2015) (MJ White) (ALJ did not err in assigning little weight to an opinion based on a claimant's self-reports, which themselves were not credible).

Accordingly, the ALJ's explanation includes "enough to allow the appellate court to trace the path of his reasoning." *Stacey*, 451 F. App'x at 519 (6th Cir. 2011). There is no error here.

### c. |Step Three - Paragraph "B" Evaluation

Claimant argues that the ALJ erred in his "B criteria" evaluation of Listings 12.04 (depressive, bipolar, and related disorders), 12.06 (Anxiety and obsessive-compulsive disorders). Specifically, Claimant argues that the ALJ failed to properly consider that:

> [a]ccording to The Nord Center, Heffner's apartment was disheveled (Tr. 465), she appeared anxious (Tr. 483, 706), she experienced rapid mood changes (Tr. 491, 509), she had anxiety relating to use of a motor vehicle (Tr. 501), she had depressive symptoms (Tr. 694, 702, 728), she had an increase in anxiety (Tr. 691, 728, 734), she isolated herself (Tr. 750), and she needed help staying in her own place (Tr. 688). In addition, Heffner had a history of hospitalizations for suicidal attempts (Tr. 405-406, 595-601, 392-393, 305-309, 371-372, and 760-765).

(ECF No. 17 at 12). Claimant's main argument is that the "ALJ glossed over her problems, especially the acknowledged six hospitalizations for self-injurious behavior or thoughts. (ECF No. 17 at 12). The Commissioner argues that the ALJ reasonably concluded that Claimant had no more than moderate limitations in any of the paragraph B criteria of the listings. The ALJ found that Claimant did not meet Listings 12.04 or 12.06 because she had only a moderate limitation in understanding, remembering, or applying information; moderate limitation in concentrating, persisting, or maintaining pace; moderate limitation in managing himself; and moderate limitation in interacting with others. (ECF. No. 13, PageID #: 89-90).

To satisfy paragraph B, Claimant must also show extreme limitation of one or marked limitation of two of the following: understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; adapt or manage oneself. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 12.04(B), 12.08(B), 12.11(B). "A marked limitation may arise where several activities or functions are impaired or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652-53 (6th Cir. 2009). A moderate limitation is defined as having a fair ability to function independently, appropriately, effectively, and on a sustained basis in an area. *See* 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.00F.2.c.

Substantial evidence supports the ALJ's finding.

### i. Understand, remember, or apply information (paragraph B1).

"This area of mental functioning refers to the abilities to learn, recall, and use information to perform work activities." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 12.00(E)(1). "Examples include: Understanding and learning terms, instructions, procedures; following one- or two-step oral instructions to carry out a task; describing work activity to someone else; asking and answering questions and providing explanations; recognizing a mistake and correcting it; identifying and solving problems; sequencing multi-step activities; and using reason and judgment to make work-related decisions." *Id.*

The ALJ explained that he found Claimant to be moderately limited with respect to understanding, remembering, or applying information, because although she testified that she was unable to work due to anxiety and needed reminders to take her medication, she had average intelligence, reported that she was able to complete activities of daily living independently, and

Dr. Noveske and Nurse Gilbert of the Nord Center consistently reported that her thought process was logical and her memory was good. (ECF No. 13, PageID #: 89, 98, 555, 604-605, 767, 770-771). The ALJ's finding is also supported by the medical opinion evidence. Dr. Smith, the consultative psychological examiner, did not opine as to the level of limitation Claimant may have in this functional area. The State agency reviewing psychologists both opined that Claimant would have no more than moderate limitations in this functional area.

These facts support a finding that Claimant had a fair ability to function independently, appropriately, effectively, and on a sustained basis in the area of understanding, remembering, or applying information. Claimant has failed to cite to any specific facts that were overlooked by the ALJ with respect to this functional area. Accordingly, substantial evidence supports the ALJ's determination that Claimant had moderate limitation in understanding, remembering, or applying information.

### ii. Interact with others (paragraph B2).

"This area of mental functioning refers to the abilities to relate to and work with supervisors, co-workers, and the public." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 12.00(E)(2). "Examples include: cooperating with others; asking for help when needed; handling conflicts with others; stating own point of view; initiating or sustaining conversation; understanding and responding to social cues (physical, verbal, emotional); responding to requests, suggestions, criticism, correction, and challenges; and keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness." *Id.*

The ALJ found that Claimant had a moderate limitation in her ability to interact with others and substantial evidence supports the ALJ's conclusion. Although Claimant testified that she preferred not to be around large groups of people and her anxiety worsened during confrontations

and arguments, the evidence shows that she enjoyed spending time with friends, and she got along with her siblings and her mother. (ECF No. 13, PageID #: 89, 124, 128, 542, 770). Furthermore, Dr. Noveske and Nurse Gilbert consistently reported that Claimant's behavior was cooperative and her eye contact was average, she attended medical appointments without incident, and she had no history of assaultive behavior, violent outbursts, or aggression. (ECF No. 13, PageID #: 89, 93-97, 558, 767, 770-771). The ALJ's finding is also supported by the medical opinion evidence. Dr. Smith, the consultative psychological examiner, did not opine as to the level of limitation Claimant may have in this functional area. The State agency reviewing psychologists both opined that Claimant would have no more than moderate limitations in this functional area.

These facts support a finding that Claimant had a fair ability to function independently, appropriately, effectively, and on a sustained basis in the area of interacting with others. Claimant has failed to cite to any specific facts that were overlooked by the ALJ with respect to this functional area. Accordingly, the ALJ's determination that Claimant suffered moderate limitation in her ability to interact with others is supported by substantial evidence.

### iii.    Concentrate, persist, or maintain pace (paragraph B3)

The ALJ found that Claimant had moderate limitations in concentrating, persisting, or maintaining pace. Substantial evidence supports the ALJ's conclusion. "This area of mental functioning refers to the abilities to focus attention on work activities and stay on task at a sustained rate." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 12.00(E)(3). "Examples include: initiating and performing a task that you understand and know how to do; working at an appropriate and consistent pace; completing tasks in a timely manner; ignoring or avoiding distractions while working; changing activities or work settings without being disruptive; working close to or with others without interrupting or distracting them; sustaining an ordinary routine and regular

33

attendance at work; and working a full day without needing more than the allotted number or length of rest periods during the day." *Id.*

The ALJ explained that he found moderate limitations with regard to concentrating, persisting, or maintaining pace because although Claimant testified that she had problems with concentration, she did some household chores, she enjoyed cooking and writing, she read two books a day, and she managed her own money. (ECF No. 13, Page ID #: 89, 93-97, 127-128, 556, 564, 764). Furthermore, Dr. Noveske and Nurse Gilbert reported that Claimant's concentration and attention were no more than mildly impaired and that she had no vegetative symptoms. (ECF No. 13, Page ID #: 89, 93-97, 558, 568, 767, 770-771). The ALJ's finding is also supported by the medical opinion evidence. Dr. Smith, the consultative psychological examiner, did not opine as to the level of limitation Claimant may have in this functional area. The State agency reviewing psychologists both opined that Claimant would have no more than moderate limitations in this functional area. As explained above, Dr. Siscu's opinion that Claimant would require additional breaks per day was not supported by the record. Nonetheless, Dr. Siscu did not indicate that Claimant was more than moderately limited in this area.

These facts support a finding that Claimant had a fair ability to function independently, appropriately, effectively, and on a sustained basis in the area of concentrating, persisting, or maintaining pace. Claimant failed to allege any specific facts that the ALJ did not consider that would demonstrate more than a moderate limitation in her ability to function in this area. Accordingly, the ALJ's determination that Claimant suffered moderate limitation in this area is supported by substantial evidence.

### iv. Adapt or manage oneself (paragraph B4).

Finally, the ALJ found that Claimant has moderate limitations in managing herself. "This

area of mental functioning refers to the abilities to regulate emotions, control behavior, and maintain well-being in a work setting." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 12.00(E)(4). "Examples include: responding to demands; adapting to changes; managing your psychologically based symptoms; distinguishing between acceptable and unacceptable work performance; setting realistic goals; making plans for yourself independently of others; maintaining personal hygiene and attire appropriate to a work setting; and being aware of normal hazards and taking appropriate precautions." *Id*.

Claimant stresses that the ALJ merely "glossed" over her suicide attempts and failed to give them proper consideration. However, the ALJ recognized that Claimant had multiple psychiatric hospitalizations due to attempted suicide but explained that these hospitalizations were extremely brief and usually were in the context of conflicts with her father. (ECF No. 13, PageID #: 90, 93-97, 378, 465, 478, 666, 669, 839). The ALJ explained there was no evidence of violent outbursts, and Claimant did not require or receive any intensive outpatient mental health services during the relevant period. (ECF No. 13, PageID #: 90, 93-97) Furthermore, Claimant's psychiatric hospitalizations were generally precipitated by her failure to take her prescribed psychotropic medications, and Claimant acknowledged that her condition rapidly improved once her medications were reinstated. (ECF No. 13, PageID #: 374, 378-379, 446, 465-467, 478, 580, 669, 770-771, 846). Here, the ALJ expressly considered the impact that Claimant's suicide attempts had on the "paragraph B" criteria regarding her ability to manger herself.

Additionally, the record demonstrates that Claimant was able to make plans for herself independently of others; maintain personal hygiene and attire; and be aware of normal hazards and taking appropriate precautions. For example, Claimant recognized that her father was a trigger for her depression, and she removed herself from the situation by moving out. (ECF No. 13, PageID

#: 130, 131). Additionally, the medical records demonstrate that Claimant nearly always appeared with proper hygiene and attire.

The ALJ's finding is also supported by the medical opinion evidence. Dr. Smith, the consultative psychological examiner, did not opine as to the level of limitation Claimant may have in this functional area. The State agency reviewing psychologists both opined that Claimant would have no more than moderate limitations in this functional area.

These facts support a finding that Claimant had a fair ability to function independently, appropriately, effectively, and on a sustained basis in managing herself. Claimant failed to allege any specific facts that the ALJ did not consider that would demonstrate more than a moderate limitation in her ability to function in this area. Accordingly, the ALJ's determination that Claimant suffered moderate limitation in this area is supported by substantial evidence.

### d.  Step Three - Substantial Evidence Supports the RFC

Claimant argues that the ALJ failed to properly consider the evidence of her physical impairments in an RFC for work at the medium level of exertion. (ECF No. 17 at 12). As support for the severity of these impairments, Claimant cites to: 1) her Function Report indicating that she was in constant pain from her fibromyalgia; 2) pain in her hips; 3) diagnosis of chronic low back pain and bilateral knee pain; and 4) enthesis in left knee. (ECF No. 17 at 11-12, 14).

A claimant's RFC is the most she can do despite the physical and mental limitations resulting from her impairments. *See* 20 C.F.R. § 404.1545(a). The ALJ, rather than a physician, bears the responsibility for determining the RFC. *See Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 156 (6th Cir. 2009). In carrying out this responsibility, the ALJ makes the ultimate finding regarding an individual's ability to perform work-related activities based upon "consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical

evidence, such as observations of lay witnesses of an individual's apparent symptomatology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence." Social Securing Ruling (SSR) 96–5p, 1996 WL 374183 at *5 (July 2, 1996); *see also Eslinger v. Comm'r of Soc. Sec.*, 476 F. App'x 618, 621 (6th Cir. 2012) (citing 20 C.F.R. § 404.1545(a)(3)). Although the ALJ may not substitute his opinion for that of a physician, "an ALJ does not improperly assume the role of a medical expert" by assessing the various evidence before rendering the RFC finding. *See Poe*, 342 F. App'x at 156-57.

"When formulating an RFC, an ALJ must consider the combined effect of all of the claimant's impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." *Kochenour v. Comm'r of Soc. Sec.*, No. 3:14-CV-2451, 2015 WL 9258609, at *6 (N.D. Ohio Dec. 18, 2015) (quotation marks and alteration omitted) (*citing LaRiccia v. Comm'r of Soc. Sec.*, 549 F. App'x 377, 388 (6th Cir. 2013) ("[T]he ALJ's assessment of residual functional capacity reflects a claimant's functional capacity in light of all his limitations, not just those that are severe.")). The ALJ must do so because:

> [w]hile a 'not severe' impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may—when considered with limitations or restrictions due to other impairments—be critical to the outcome of a claim. For example, in combination with limitations imposed by an individual's other impairments, the limitations due to such a 'not severe' impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do.

*Patterson v. Colvin*, No. 5:14-cv-1470, 2015 WL 5560121, at *4 (N.D. Ohio Sept. 21, 2015) (citations omitted). Said differently, "'an ALJ's conclusion that an impairment is non-severe is not tantamount to a conclusion that the same impairment . . . does not impose any work-related

restrictions.'" *Kochenour*, 2015 WL 9258609, at *6 (*quoting Patterson*, 2015 WL 5560121, at *4).

In this case, the ALJ found Claimant had several mental impairments and asthma but no severe physical impairments related to her chronic low back pain, chronic knee pain, and fibromyalgia. The ALJ found that Claimant could lift up to 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds ((ECF No. 13, PageID #: 90); 20 C.F.R. § 404.1567(b); 20 C.F.R. § 416.967) but further limited Claimant to frequently climb ramps and stairs; occasionally climb ladders, ropes, or scaffolds; frequently balance, stoop, kneel, crouch, and crawl; occasionally be exposed to unprotected heights, moving mechanical parts, or operate a motor vehicle; frequently be exposed to humidity and wetness, dust, odors, fumes, pulmonary irritants, extreme cold, and extreme heat[.]" (ECF No. 13, PageID #: 90). The ALJ's finding is supported by the evidence in the record that Claimant's treatment was minimal and conservative during the period at question – Claimant was treated with mild medication only such as NSAIDs. Claimant's principal complaint of pain in her back and legs is unsupported by diagnostic test results. As discussed above, images of Claimant's back and knees showed an absence of abnormalities and she had failed to attempt any treatment modalities that were likely to significantly alleviate her pain. Claimant's overall treatment history and the objective medical evidence support the ALJ's finding that Claimant could perform medium work.

Accordingly, the Court concludes that substantial evidence supports the ALJ's determination.

### 2. Substantial Evidence Supports the ALJ's Finding that Claimant's Subjective Complaints were not Entirely Consistent with the Record Evidence.

The evaluation of a claimant's subjective complaints rests with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers*, 486 F.3d at 248

(noting that "credibility determinations regarding subjective complaints rest with the ALJ"). In evaluating a claimant's symptoms, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. 20 C.F.R. § 404.1529(c); SSR 16-3p, 2017 WL 5180304. Beyond medical evidence, SSR 16-3p sets forth seven factors that the ALJ should consider. The ALJ need not analyze all seven factors but should show that he considered the relevant evidence. *See Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005). "[I]f an individual's statements about the intensity, persistence, and limiting effects of symptoms are inconsistent with the objective medical evidence and the other evidence, we will determine that the individual's symptoms are less likely to reduce his or her capacities to perform work-related activities or abilities to function independently, appropriately, and effectively in an age-appropriate manner." SSR 16-3P, 2017 WL 5180304. The ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms ... and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2017 WL 5180304; *see also Felisky v. Bowen*, 35 F.2d 1027, 1036 (6th Cir. 1994) ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so."). Although a reviewing court gives deference to an ALJ's credibility determination, "the ALJ's credibility determination will not be upheld if it is unsupported by the record or insufficiently explained." *Carr v. Comm'r of Soc. Sec.*, No. 3:18CV1639, 2019 WL 2465273, at *10 (N.D. Ohio April 24, 2019) (citing *Rogers*, 486 F.3d at 248-49), report and recommendation adopted by 2019 WL 3752687 (N.D. Ohio Aug. 8, 2019).

Claimant states that "the ALJ did not properly evaluate the medical evidence and make a defensible determination as to whether Heffner' [sic] testimony was credible." (ECF No. 17 at 20).  Here, the ALJ identified Claimant's subjective complaints:

> At the hearing, the claimant testified that she is unable to work due to anxiety. Her anxiety worsens when she is around people, especially when she is around more than five people. Her anxiety also worsens during confrontations and arguments. She has trouble concentrating described as jumping from one thing to another. The claimant further testified that she forgets to take her medication so her mother calls her daily to remind her. She does household chores when she is able to focus, and her mother comes over to help her with them. The claimant testified that she has pain in her back (mid and low back) and legs. The pain is "constant" and at a 6/10 with medications (8/10 without medications). She can sit for 60 minutes; stand for 120 to 180 minutes; walk around the block twice; and lift 20 pounds.

 (ECF No. 13, PageID #: 91).

The ALJ adequately discussed Claimant's subjective complaints in his decision. *See Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014). Specifically, with respect to Claimant's symptoms of depression and anxiety, the ALJ discussed Claimant's multiple suicide attempts and her anxiety associated with riding in cars, confrontations, and in groups of people. (ECF No. 13, PageID #: 94, 95, and 96). The ALJ explained that her symptoms were improved when she was on her medication and that Claimant's "clinical assessments/mental status examinations and course of treatment [ ] are not consistent with disabling mental impairment and are more consistent with the stated residual functional capacity. (ECF No. 13, Page ID #: 98). With respect to Claimant's stated inability to concentrate, the ALJ found that Claimant was moderately limited explaining that she can do household chores, cook, write for enjoyment, manage her money, and frequently read (two books a day). (ECF No. 13, PageID #: 89). The ALJ also referenced several medical records that reflect normal to mildly impaired concentration. (*See*

ECF No. 13, PageID :# 93, 94, 96, 97, 98). As discussed above, the ALJ adequately discussed Claimant's symptoms of back and leg pain and determined that the "objective medical evidence, clinical findings on examination, and course of treatment [ ] are not consistent with disabling physical impairment or disabling pain and are more consistent with the stated [RFC]". (ECF No. 13, PageID #: 97). The ALJ further explained that the imaging was consistently "normal or unremarkable[;]" they physical examinations were unremarkable; and that Claimant had not required treatment on a regular basis for any particular medical condition. (ECF No. 13, PageID #: 97-98). The ALJ also considered the side effects of Claimant's medications and found that the medical record does not establish that the side effects would interfere significantly with her ability to perform work within the RFC. (ECF No. 13, PageID #: 100).

The ALJ's decision as a whole satisfies the Court that the ALJ considered all of the relevant evidence and that a reasonable mind might accept that evidence as adequate to support the ALJ's credibility finding. There exists, therefore, no compelling reason for the Court to disturb that finding. *Cross,* 373 F. Supp. 2d at 732.

### 3.  The Commissioner Met His Burden at Step Five

Claimant argues that the ALJ failed to meet his burden at step five by disregarding any objective or subjective evidence that would have resulted in a finding of disabled. (ECF No. 17 at 21).

At step five the Commissioner has the burden of proof to show "that there is work available in the economy that the claimant can perform." *Her v.  Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999). "The step five analysis is meant to determine, given the severity of the impairments *already proven*, whether there are jobs in the economy which a claimant can perform." *Id.* (emphasis added). If a Claimant has not established limitations to be included in an RFC by step

four, the burden does not shift to the Commissioner to prove an RFC – or its limitations – at step five. *Id*. at 392. Thus, Claimant's attempt to shift the burden of proving the RFC onto the Commissioner at step five is improper.

Moreover, the Commissioner properly met his burden to determine that there is work available in the economy that the claimant can perform at step five. To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (internal quotation marks and citation omitted). "This substantial evidence may be in the form of vocational expert testimony in response to a hypothetical question, but only if the question accurately portrays [the claimant's] individual physical and mental impairments." *Baker v. Barnhart*, 182 F. App'x 497, 500 (6th Cir. 2006) (citations and internal quotation marks omitted). The Commissioner met this burden through the testimony of the vocational expert, who testified that work exists in the national economy that accommodates Claimant's RFC and vocational factors. Therefore, the ALJ found that she is not disabled.

During the hearing, the ALJ posed several hypotheticals including a third hypothetical which assumed:

> a hypothetical individual of the Claimant's age and education. …
> that the hypothetical individual is limited …to performing simple,
> routine, and repetitive tasks, but not at a production rate pace, i.e.,
> assembly line work. … simple work-related decisions and using her
> judgement and dealing with changes in the work setting. Able to
> occasionally interact with supervisors, coworkers, and the public…
>
> [ ]
>
> limited to medium [exertional level], frequent climbing of ramps
> and stairs. Occasional climbing of ladders, ropes, or scaffolds.
> Frequently balance, stoop, kneel, crouch, crawl. Occasional
> exposure to unprotected heights, moving mechanical parts, and the
> operation of a motor vehicle. Frequent exposure to humidity and

wetness, dust, odors, and pulmonary irritants, extreme cold and extreme heat[.]

(ECF No. 13, PageID #: 132, 134). The vocational expert testified that such a person would be able to perform work at several exertional levels, including medium exertion, and that multiple jobs were available for such a person such as a kitchen helper, gluer, and an assembler of electrical accessories. (ECF No. 13, PageID #: 133, 134).

The hypothetical posed by the ALJ to the vocational expert properly included Claimant's limitations that the ALJ found were supported by the record. Although the ALJ raised with the vocational expert additional limitations pertaining to additional hypotheticals, the ALJ concluded that these limitations did not apply to Claimant, which was supported by substantial evidence and within his "zone of choice". The vocational expert testified that there were approximately 1,174,000 jobs nationwide available to someone with Claimant's vocational profile, including the restrictions the ALJ found supported by the record as a whole. (ECF No. 13, PageID #: 133).

The Court has concluded that substantial evidence supports the RFC as the ALJ fashioned it. And the ALJ's third hypothetical mirrored the RFC in this case. (*(Compare* ECF No. 13, PageID #: 91, *and* ECF No. 13, PageID #: 101 and 134).). Thus, the vocational expert's opinion is itself substantial evidence for the ALJ's Step 5 conclusion that there are jobs that exist in significant numbers in the national economy that Claimant could do despite her limitations. *Smith v. Halter,* 307 F.3d 377, 378 (6th Cir. 2001) (citation omitted); *Baker*, 182 F. App'x at 500.

### 4. Substantial Evidence Supports the ALJ's Finding that Claimant was not Entitled to a Supplemental Hearing Regarding the Vocational Evidence.

The Sixth Circuit has acknowledged that due process principles apply to Social Security proceedings. *Robinson v. Barnhart*, 124 F. App'x 405, 410 (6th Cir. 2005). Due process requires a social security hearing be "full and fair." *Laddy v. Astrue*, No. 4:11-cv-293, 2012 WL 776551,

at *11 (N.D. Ohio Feb. 2, 2012), report and recommendation adopted by 2012 WL 777137 (Mar. 8, 2012). A claimant must have the opportunity to present all of the evidence, as well as confront the evidence against her. *Id.* (citing *Flatfor v. Chater*, 93 F.3d 1296, 1306 (6th Cir. 1996)). While there is not an absolute right to cross-examination for the development of a complete record, it should be available "where reasonably necessary to the full development of the case." *Flatfor*, 93 F.3d at 1307.

On October 26, 2018, after the hearing, Claimant submitted a post-hearing memorandum arguing that a supplemental hearing was necessary or, alternatively, for interrogatories. (ECF No. 13, PageID #: 360). The ALJ denied Claimant's request for a supplemental hearing or to issue interrogatories stating that

> the hearing was held on October 10, 2018 and these documents were submitted on October 27, 2018. At the hearing, Mr. Liner advised that the record was complete and he never requested that I hold the record open for a post hearing brief or additional evidence. Moreover, I allowed Mr. Liner to fully examine the vocational expert and he stipulated to the vocational expert's qualifications at the hearing. Mr. Liner never claimed 'surprise' or asked for additional time to evaluate the vocational expert's testimony at the hearing. I deny these requests and objections.

(ECF No. 13, PageID #: 101).

HALLEX I-2-6-80 provides the framework in which a supplemental hearing is necessary. 1993 WL 751905. This section notes that a supplemental hearing is appropriate when: 1) certain testimony or a document takes the claimant by surprise, "is adverse to the claimant's interest, and presents evidence that the claimant could not reasonably have anticipated and to which the claimant is not prepared to respond;" 2) the ALJ believes additional testimony regarding the new issue is appropriate; 3) the ALJ, during the hearing, discovers that the testimony of additional person, who is not present, is needed; 4) the claimant or the ALJ wishes to present evidence, but

cannot present it "without diminishing its probative value because of the absence of opportunity to for detailed examination or cross examination of the witness;" 5) an order or remand directs the ALJ to hold a supplemental hearing; 6) a request is made to cross-examine the author or provider of post-hearing evidence. HALLEX I-2-6-80.

Although Claimant argued unfair surprise in her post-hearing memorandum,[2] she fails to address unfair surprise (or any other basis for a supplemental hearing) in her appeal to this Court. (ECF No. 17 at 22). Instead, Claimant simply argues that the ALJ had sufficient time to hold a supplemental hearing or issue interrogatories and, therefore, erred by denying Claimant's request. (ECF No. 17 at 22). However, that is not the standard provided in HALLEX I-2-6-80.

The ALJ complied with the standard set forth in HALLEX I-2-6-80 and Claimant has failed to establish she was unfairly surprised by the vocational expert's testimony. Accordingly, there is no error.

## VI. Recommendation

Based on the foregoing, it is RECOMMENDED that the Court OVERRULE Claimant's Statement of Errors and AFFIRM the Commissioner's decision.

Dated: 5/6/2021

s/ *Carmen E. Henderson*
CARMEN E. HENDERSON
U.S. MAGISTRATE JUDGE

---

[2] In her post-hearing memorandum, Heffner argued that: "Since the Claimant could not be reasonably expected to have known Your Honor's hypothetical assumptions before the hearing itself, and since the vocational expert in this case did not provide a report prior to the hearing, the vocational expert's testimony was 'surprise testimony' which could not be reasonably prepared for in advance or, given the complexity of the vocational testimony, responded to immediately, without the ability to consult the vocational source materials relied upon by the vocational expert first." (ECF No. 13, PageID #: 360). She argued that "a supplemental hearing is necessary" under HALLEX I-2-6-80 (ECF No. 13, PageID #: 360). Counsel also proffered "rebuttal vocational evidence" consisting of a vocational opinion by a Mr. Heckman. (ECF No. 13, PageID #: 355).

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F. 3d 520, 530-31 (6th Cir. 2019).